UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GEORGE ELVER,

        Plaintiff,

v.                             Case No: 2:18-cv-102-FtM-29CM

STEVE WHIDDEN, in his
official capacity as Sheriff
of Hendry County, Florida
and STEVE WHIDDEN, in his
individual capacity,

        Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on defendant's Motion for
Summary Judgment (Doc. #40) filed on October 12, 2018. Plaintiff
filed a Response in Opposition (Doc. #52) on November 14, 2018,
defendant filed a Reply (Doc. #55) on December 10, 2018, and
plaintiff filed a Sur-Reply (Doc. #58) on December 27, 2018. For
the reasons that follow, the motion is granted.

## I.

Plaintiff George Elver has filed a three-count Amended
Complaint against defendant Steve Whidden, Sheriff of the Hendry
County Sheriff's Office ("HCSO"). (Doc. #4.) Plaintiff is a
former HCSO police officer whose employment was terminated in July
2017. Count One of the Amended Complaint is against defendant in
his official capacity as Sheriff of Hendry County, and alleges

defendant violated Florida's Whistleblower Act, section 112.387, Florida Statutes, by retaliating against plaintiff after he reported the wrongdoings of another officer. (Id. pp. 11-12.) Counts Two and Three are pled alternatively against defendant in his individual capacity and in his official capacity, and allege defendant violated 42 U.S.C. § 1983 by retaliating against plaintiff for exercising his First Amendment rights. (Id. pp. 12-17.) The crux of the three claims is plaintiff's allegation that he was discharged in retaliation for his involvement in reporting the improper actions of a fellow police officer, and subsequently testifying against that officer at a criminal trial. (Id. pp. 11-17.)

**A. Factual Background**

Plaintiff began his employment with HCSO in 2002, was appointed a Deputy Sheriff in 2005, and was reappointed in 2009 by defendant.[1] (Doc. #40-2, pp. 238, 242-43.) During his fourteen-year career with HCSO, plaintiff was promoted to sergeant and patrol supervisor, while also working as a member and team leader of the agency's SWAT and sniper teams. (Doc. #45-28, p. 660; Doc. #45-1, p. 8.) In that time, plaintiff was also subjected to several disciplinary actions by HCSO, ranging in severity from a

---

[1] Per plaintiff, a deputy must be reappointed when a new sheriff is elected. (Doc. #40-2, pp. 69-70.)

letter of reprimand to a five-day suspension. (Doc. #40-2, pp. 100-05.)

**1. Archer Matter**

On the evening of July 17, 2016, plaintiff was beginning his shift when he received a text message from a fellow officer, Sergeant Robert Archer, asking to meet.[2] (Doc. 45-28, pp. 660-62.) Plaintiff arrived at the residence Archer had indicated and met Archer outside. (Id. p. 662.) Archer explained he had entered the residence after responding to a disturbance call and was now waiting for a search warrant from narcotics investigators. (Id. pp. 663-64.) Plaintiff left the area for a few minutes and when he returned, he found Archer and two narcotics investigators inside the home. (Id. pp. 664-66.) At this point, plaintiff learned a search warrant had not been approved. (Id. p. 666.) Inside the home, the investigators asked Archer if he wanted their assistance and Archer answered negatively. (Id.) Archer then came closer to plaintiff and said, "I wish they would just leave so we could do our thing." (Id. p. 667.) Plaintiff did not know what this meant and did not want to find out. (Id.)

---

[2] The description of the events of July 17th is derived from plaintiff's testimony at Archer's criminal trial. The Court accepts these facts for purposes of ruling on the Motion for Summary Judgment, although such "facts" may not be the "actual" facts of the case. See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000).

Plaintiff and the investigators exited the residence and the investigators left the area. (Id.) Plaintiff remained outside to speak with two deputies who had arrived on the scene. (Id.) When Archer exited the residence, he was carrying property from inside and said to plaintiff, "[D]on't worry about the video, I took care of the DVR, it won't work again." (Id. pp. 671-72.) By this, plaintiff assumed Archer had disabled the surveillance system inside the residence. (Id. p. 672.)

Around this time a tow truck arrived to tow an SUV parked at the residence. (Id. pp. 668-69.) Archer, one of the deputies, and plaintiff began to inventory the SUV when plaintiff became concerned there may not be a lawful reason to tow the vehicle. (Id. pp. 673, 677-78.) Plaintiff asked Archer why the SUV was being towed and Archer responded, "I'm going to do some creative writing, don't worry, I have got it." (Id. pp. 677-78.) At that point, plaintiff ordered the deputies to put the inventoried property back in the vehicle and tape the doors closed. (Id. p. 679.) In response, Archer asked plaintiff, "What, you don't trust my report writing?" (Id.)

Plaintiff was subsequently interviewed about this incident by an investigator with the State Attorney's Office of the Twentieth Judicial Circuit. (Doc. #45-19, pp. 573-89). In December 2016, Archer was charged with three counts of perjury and one count of official misconduct. (Doc. #45-20, pp. 591-92.) In March 2017,

plaintiff was subpoenaed to provide testimony at Archer's trial, which was to begin on April 11, 2017. (Doc. #45-22, p. 600.)

## 2. Shift Transfer

Nineteen days after plaintiff was subpoenaed to testify against Archer, Chief Kevin Nelson and Lieutenants Shawn Reed, Michael Stevens, and Joshua Woods attended a lieutenants meeting. (Doc. #40-3, p. 443; Doc. #40-6, p. 495; Doc. #40-7, p. 533.) During the meeting, Lieutenants Reed and Stevens informed Chief Nelson that plaintiff was going to be transferred from his night shift in Labelle to the night shift in Clewiston.[3] (Id.) In response, Lieutenant Woods expressed an opinion plaintiff may resign rather than accept the transfer. (Id.; Doc. #47-2, p. 27-28.) Chief Nelson told Lieutenant Woods that if plaintiff quit, Lieutenant Woods was to take his badge and weapon. (Id.) Lieutenant Woods told plaintiff of this discussion prior to the events on the following day. (Doc. #47-2, p. 27-28.)

Plaintiff was informed of his shift change via an email from Lieutenant Reed. (Doc. #45-23, p. 603.) The email explained that the change was being made because another sergeant had resigned and the remaining deputies in Clewiston were inexperienced. (Doc.

---

[3] Chief Nelson and Lieutenants Reed and Stevens state that Archer's trial and plaintiff's involvement as a witness were never discussed during the meeting. (Doc. #40-3, pp. 443-44; Doc. #40-6, p. 495; Doc. #40-7, p. 533.) Lieutenant Woods does not remember any such discussion either. (Doc. #45-11, p. 490.)

#45-23, p. 603.) The email apologized for the short notice and stated the move was not punishment. (Id.)

Plaintiff strongly objected to the transfer. He had previously worked in Clewiston and had negative opinions about the town. (Doc. #45-1, p. 12.) The day after receiving the email, plaintiff attended a sergeants meeting at which Lieutenants Reed and Stevens were present. (Doc. #45-1, p. 12; Doc. #40-6, p. 493; Doc. #40-7, p. 533.) During the meeting, plaintiff repeatedly requested an explanation for the transfer. (Id.) Lieutenants Reed and Stevens informed plaintiff they would meet with him afterwards to discuss the matter, but plaintiff insisted he receive an answer in front of witnesses.[4] (Id.) Lieutenant Stevens concluded the meeting and again invited plaintiff to meet with him and Lieutenant Reed privately. (Id.) Lieutenant Stevens also permitted plaintiff to record the meeting in lieu of having witnesses present. (Id.)

In the private meeting afterwards, which was recorded and lasted about eleven minutes, plaintiff again requested an

---

[4] Plaintiff states that he requested a witness because he knew Lieutenants Reed and Stevens had recently joked about hoping plaintiff would quit rather than accept the transfer. (Doc. #45-1, p. 12.) Lieutenant Woods testified at a deposition that when he expressed his concerns during the lieutenants meeting on March 29th, there was laughter in response and one of the other individuals expressed a hope plaintiff would in fact resign. (Doc. #45-11, p. 489.)

explanation as to why he was being transferred. (Doc. #45-25, p. 606.) Lieutenants Reed and Stevens explained that the transfer was being made because they wanted someone with experience in Clewiston with the new deputies. (Id.) Plaintiff disputed this explanation and repeatedly suggested the move was punitive. (Id. pp. 607-10, 623.) When plaintiff asked why he was being transferred rather than other sergeants, Lieutenants Reed and Stevens responded that they wanted his experience and that by transferring him, plaintiff would still be working the same hours and same days. (Id. p. 608.) During the conversation, plaintiff accused Lieutenant Reed of calling plaintiff stupid, ignorant, and an idiot during a phone call the night before, which Lieutenant Reed denied. (Id. pp. 610-11.) Plaintiff responded by telling Lieutenant Reed to "have some integrity."[5] (Id. p. 611.) He also suggested the transfer was made to induce plaintiff to quit. (Id. p. 622.) Finally, plaintiff asked if the move had anything to do with the fact that he was "one of the lead witnesses" against Archer. (Id. p. 613.) Lieutenants Reed and Stevens both answered negatively, stating neither knew plaintiff was a witness to

_____

[5] Lieutenant Reed was plaintiff's direct supervisor from mid-December 2016 until March 2017, and had reprimanded him in the past for unrelated incidents. (Doc. #40-6, pp. 493-94, 498-509.) Plaintiff states that Lieutenant Reed was the only supervisor who ever had "an issue" with plaintiff, and described the previous reprimands as "bogus write ups." (Doc. #45-1, p. 9.)

anything. (Id.) Towards the end of the meeting, plaintiff
suggested he was being singled out and informed the lieutenants he
was going to voice his opinion that "this is not how we have
handled things at this sheriff's agency since 2002." (Id. p. 621.)

### 3. Internal Affairs Investigation

On April 5, 2017, six days after the recorded conversation,
Lieutenant Reed reprimanded plaintiff for misconduct allegedly
occurring three months earlier. (Doc. #40-6, pp. 493-94, 498-
502.) On April 10, 2017, eleven days after the recorded
conversation and the day plaintiff testified against Archer at the
criminal trial, Lieutenant Stevens wrote a memo to Chief Nelson
requesting an internal investigation of plaintiff. (Doc. #40-7,
p. 554.) The memo stated Lieutenant Stevens had learned plaintiff
had played the recording of their conversation to his subordinates
in Clewiston and allegedly made disparaging comments about
Lieutenants Stevens and Reed. (Id. pp. 554-55.) The memo
suggested plaintiff's actions undermined the lieutenants'
authority and undercut agency moral, and that plaintiff had
violated several HCSO rules and regulations. (Id.)

Upon receiving Lieutenant Stevens request, Chief Nelson wrote
a memo instructing Lieutenant Ben Rowe to conduct an internal
investigation.[6] (Doc. #45-29, p. 692.) The same day, which was

---

[6] A week previously, Chief Nelson had instructed Lieutenant
Rowe to investigate plaintiff for allegations of misconduct

the day after he testified in the Archer trial, plaintiff was placed on administrative leave.[7] (Doc. #45-1, p. 14.)

During the investigation, Lieutenant Rowe interviewed fifteen HCSO officers, including plaintiff. (Doc. #40-8, pp. 587-88.) Plaintiff did not dispute that he played the recording for other officers, including his subordinates. (Doc. #47-3, p. 57.) He also did not dispute expressing to the officers his unhappiness with being transferred to Clewiston or his opinion that another sergeant should have been transferred instead. (Id. pp. 57-58.) He acknowledged he may have cursed during the conversation with the other officers but disputed talking negatively about Lieutenant Reed.[8] (Id. pp. 58-59.)

---

unrelated to the recording. (Doc. #40-8, p. 562.) Lieutenant Rowe ultimately determined those allegations were unsubstantiated. (Id. p. 557.)

[7] Archer was ultimately found not guilty of the four criminal charges but subsequently convicted of contempt of court due to his actions on July 17th. (Doc. #47-14, p. 151.) On orders from Chief Nelson, Lieutenant Rowe began an internal affairs investigation into the matter, but Archer resigned from his employment before the investigation concluded. (Doc. #40-8, p. 560.)

[8] Other officers stated plaintiff had made it known he did not like Lieutenant Reed and had also accused Lieutenants Reed and Stevens of lying about the reason for the transfer. (Doc. #46-6, p. 110; Doc. #46-7, p. 121.) Furthermore, one officer stated plaintiff said he "put that bitch in his place" while referring to Lieutenant Reed. (Doc. #46-4, pp. 94-95; Doc. #46-15, pp. 209-10.)

After investigating the allegations, Lieutenant Rowe wrote a memo to Chief Nelson concluding plaintiff had violated four HCSO policies related to insubordination, criticism of orders and policies, gossip, and knowledge of rules and regulations. (Doc. #40-8, pp. 585-87.) Included in the memo were Lieutenant Rowe's interview notes. (Id. pp. 588-663.) Plaintiff subsequently challenged the investigation's findings, questioning Lieutenant Rowe's fitness for duty. (Doc. #47-8, pp. 100-02.) Chief Nelson denied the challenge, finding it "baseless, without merit and considered hearsay." (Doc. #47-10, p. 136.)

### 4. Employment Termination

After receiving Lieutenant Rowe's report, and pursuant to defendant's instructions, Chief Nelson directed Captain David Harney to conduct a pre-disciplinary hearing. (Doc. #40-3, p. 445; Doc. #40-1, p. 28; Doc. #40-9, p. 666.) The pre-disciplinary hearing panel consisted of Captain Harney, Captain Susan Harrelle, and Lieutenant Michael Favara. (Doc. #40-9, p. 671.) A hearing was conducted, at which plaintiff and his attorney appeared. (Doc. #47-9, pp. 106-34.) Captain Harney subsequently wrote a memo to defendant and Chief Nelson stating the panel had sustained three of the four charges from Lieutenant Rowe's report and recommended plaintiff's appointment be terminated. (Doc. #40-9, pp. 672-75.)

Upon receipt of the panel's determination, defendant accepted the recommendation and plaintiff's appointment as an HCSO officer

was terminated on July 21, 2017. (Doc. #40-1, p. 29; Doc. #40-3, p. 467.) The next day, plaintiff sent a memo to defendant requesting an audience for the purpose of appealing the pre-disciplinary hearing's determination and recommendation. (Doc. #47-12, pp. 146-47.) Plaintiff argued the investigation and hearing process violated HCSO policy, and various individuals involved in the process were biased. (Id.) Plaintiff never received a response. (Doc. #45-1, p. 16.)

## B. Procedural Background

Plaintiff filed the Amended Complaint in October 2017, alleging defendant violated Florida's Whistleblower Act, section 112.387, Florida Statutes, and 42 U.S.C. § 1983. (Doc. #4.) On October 12, 2018, defendant filed a Motion for Summary Judgment as to the three counts in plaintiff's Amended Complaint. (Doc. #40.) The motion argues (1) plaintiff cannot establish a causal connection between his testimony in the Archer matter and his dismissal, (2) even if there was a causal connection, plaintiff would have been discharged regardless due to the recording incident, and (3) defendant is entitled to qualified immunity. (Id. pp. 16-25.)

## II.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citation omitted). A fact is "material" if it may affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson, 357 F.3d at 1260 (quoting Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the nonmoving party. Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983)). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1315 (11th Cir. 2007).

**III.**

**A. Whistleblower Claim – Count One**

Florida's Whistleblower Act exists "to prevent retaliatory action against employees and persons who disclose certain types of government wrongdoing to appropriate officials." Rustowicz v. N. Broward Hosp. Dist., 174 So. 3d 414, 419 (Fla. 4th DCA 2015) (citing § 112.3187(2)-(7), Fla. Stat. (2009); Rice-Lamar v. City of Fort Lauderdale, 853 So. 2d 1125, 1131-32 (Fla. 4th DCA 2003)). "The act is remedial in nature and should be construed liberally in favor of granting access to the remedy so as not to frustrate the legislative intent." Rice-Lamar, 853 So. 2d at 1132 (citations omitted). In order to state a claim under the Whistleblower Act, "a plaintiff must allege that (1) he or she engaged in a statutorily protected activity; (2) he or she suffered an adverse employment action; and (3) there existed a causal connection between the two events." King v. Bd. of Cty. Comm'rs, 226 F. Supp. 3d 1328, 1336 (M.D. Fla. 2016) (citing Castro v. Sch. Bd. of Manatee Cty., Fla., 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012)).

**B. First Amendment Retaliation Claims – Counts Two and Three**

Section 1983 imposes liability on any person who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their

federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). Retaliation against the exercise of First Amendment rights "is a well-established basis for section 1983 liability." O'Boyle v. Sweetapple, 187 F. Supp. 3d 1365, 1370 (S.D. Fla. 2016) (citing Bennett v. Hendrix, 423 F.3d 1247, 1255-56 (11th Cir. 2005); Pendleton v. St. Louis Cty., 178 F.3d 1007, 1011 (8th Cir. 1999)). To establish a First Amendment retaliation claim under section 1983, an employee must show that (1) the speech involved a matter of public concern, (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities, and (3) the speech played a substantial part in the adverse employment action. Wilbourne v. Forsyth Cty. Sch. Dist., 306 Fed. App'x 473, 476 (11th Cir. 2009) (citing Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005)).

## IV.

### A. Whether Plaintiff Can Establish a Causal Connection

Defendant's first argument is that plaintiff cannot establish a causal connection between a protected activity or speech he engaged in and his subsequent termination. As previously noted, both a Whistleblower claim under section 112.3187, Florida Statutes, and a First Amendment retaliation claim under section 1983 require that plaintiff demonstrate causation between the

protected activity or speech and the adverse employment action.
See Wilbourne, 306 Fed. App'x at 476; King, 226 F. Supp. 3d at
1336. Defendant argues no reasonable jury could find plaintiff's
employment was terminated as a result of his trial testimony
because (1) three and a half months passed between plaintiff's
testimony at the Archer trial and his dismissal, and (2) other
officers testified and were not dismissed. (Doc. #40, pp. 16-19.)

Prior to addressing these arguments, the Court notes that
defendant focuses his causation claim only on plaintiff's
testimony at Archer's trial. (Doc. #40, p. 16.) However, the
Amended Complaint is more broadly worded, alleging plaintiff's
employment was terminated "based solely on his being subpoenaed to
testify in the investigation of Sgt. Archer, reporting Sgt.
Archer's failure to secure a search warrant when conducting an
investigation, and Plaintiff's testimony that he did not support
Sgt. Archer's wrongdoing." (Doc. #4, ¶ 48.) The Court interprets
this as an allegation plaintiff engaged in protected activity
and/or speech at different times during the Archer matter (when he
reported Archer's wrongdoing, when he was subpoenaed to testify,
and when he actually testified at Archer's trial) and was
retaliated against as a result. With this in mind, the Court now
turns to defendant's arguments.

**1. Temporal Proximity**

In analyzing the causation element of both Whistleblower claims and First Amendment retaliation claims, courts have examined whether there was a close temporal proximity between the protected activity or speech and the adverse employment action. See Fla. Dep't of Children & Families v. Shapiro, 68 So. 3d 298, 306 (Fla. 4th DCA 2011) (analyzing Whistleblower claim); Lozman v. City of Riviera Beach, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014) (analyzing First Amendment retaliation claim). Here, plaintiff's dismissal occurred on July 21, 2017, roughly eleven months after he first reported Archer's actions, four and a half months after he was subpoenaed, and three and a half months after he testified at Archer's trial. The Eleventh Circuit has stated such periods are too long by themselves to infer causation when considering retaliatory claims under Title VII.[9] See Faircloth v. Herkley Invs. Inc., 514 Fed. App'x 848, 852 (11th Cir. 2013) ("A period as long as one month between a protected activity and an adverse action is not too protracted to infer causation based on temporal proximity; a three-month period between a protected activity and an adverse action, though, cannot alone establish causation.").

---

[9] "In analyzing Florida private and public sector whistleblower actions, courts apply the same standard that is used for Title VII retaliation claims." Allocco v. City of Coral Gables, 221 F. Supp. 2d 1317, 1367 (S.D. Fla. 2002) (citations omitted).

However, while plaintiff's employment was not terminated for three and a half months after he testified, the record contains evidence of adverse employment actions occurring much earlier. On March 10, 2017, plaintiff was subpoenaed to testify at Archer's trial. (Doc. #45-22, p. 600.) On March 29th, Lieutenants Reed and Stevens transferred plaintiff to Clewiston, a shift he was vehemently opposed to. (Doc. #45-23, p. 603.) The next day, plaintiff had the recorded conversation with Lieutenants Reed and Stevens. (Doc. #45-25, p. 606.) Five days later on April 4th, Chief Nelson requested Lieutenant Rowe investigate plaintiff for an unrelated allegation of misconduct, which was ultimately found unsubstantiated. (Doc. #45-26, p. 625.) On April 5th, Lieutenant Reed reprimanded plaintiff for misconduct allegedly occurring three months earlier. (Doc. #45-27, pp. 645-49.) Plaintiff testified at Archer's trial on April 10th, and on April 11th he was placed on administrative leave due to the recording investigation. (Doc. #45-28, p. 658; Doc. #45-29, p. 692). That investigation ultimately led to plaintiff's dismissal in July.

Based on the preceding timeline of events, the Court finds plaintiff has offered sufficient evidence to create a genuine issue of material fact as to the causation element. See Laird v. Bd. of Cty. Comm'rs, 2017 WL 1147472, *7 (N.D. Fla. Mar. 26, 2017) ("Close temporal proximity between protected conduct and an adverse employment action ordinarily can supply sufficient circumstantial

evidence to create a genuine issue of material fact as to the necessary causal link."); <u>Lozman</u>, 39 F. Supp. 3d at 1405 (noting that causation for a First Amendment retaliation claim can be established with proof of "a pattern of antagonism coupled with timing"). Here, plaintiff does not rely on the three-and-a-half-month time period alone, having presented evidence of adverse employment actions taken almost immediately after being subpoenaed to testify and continuing through the day after testifying. <u>See</u> <u>Boyland v. Corr. Corp. of Am.</u>, 390 Fed. App'x 973, 974-75 (11th Cir. 2010) ("In the absence of close temporal proximity between the protected activity and the employer's adverse action, a plaintiff may be able to establish causation where intervening retaliatory acts commenced shortly after the plaintiff engaged in a protected activity.").

### 2. Testimony of Other Officers

In analyzing the causation element for a retaliatory claim, courts have also considered whether similarly situated employees suffered adverse employment action. This is true for both Whistleblower claims, <u>Allocco</u>, 221 F. Supp. 2d at 1369-70, and First Amendment retaliation claims, <u>Gainer v. City of Winter Haven,</u> <u>Fla.</u>, 170 F. Supp. 2d 1225, 1231-32 (M.D. Fla. 2001). Defendant argues that plaintiff cannot establish causation because other officers testified against Archer and were not subjected to discipline. (Doc. #40, p. 17.)

The record indicates that six HCSO employees were interviewed by the State Attorney's Office and five deputies testified at Archer's trial, but only plaintiff was subsequently discharged from employment. (Doc. #40-3, p. 446.) In fact, two of the testifying deputies were later promoted to sergeant. (Id.) Such evidence would suggest the termination of plaintiff's employment was not caused by his involvement in the Archer matter. See Butler v. City of Prairie Village, Kan., 172 F.3d 736, 746 (10th Cir. 1999) (finding the plaintiff had not established his reporting of employee thefts was a motivating factor in his termination in part because "the employee who told Plaintiff about the thefts and who reported the thefts to departmental supervisors was later named employee of the year," a fact that suggested "Plaintiff probably would not have been punished for reporting the thefts"); Allocco, 221 F. Supp. 2d at 1369-70 (finding the plaintiffs' Whistleblower claims failed because, inter alia, other employees had engaged in the same action as the plaintiffs but continued to work for the employer); Gainer, 170 F. Supp. 2d at 1231-32 ("Since two other city employees also made the same statements and were not terminated from employment, it cannot be said that this protected speech was the cause of termination.").

Nonetheless, defendant's argument for summary judgment fails. The record of plaintiff's trial testimony shows that much of it related to plaintiff's personal interaction with Archer at the

residence and Archer's statements to plaintiff. (Doc. #45-28, pp. 663-79.) That testimony suggested Archer had searched a residence without a warrant, may have destroyed a surveillance system inside the residence, and may have intended to falsify a report to have a vehicle towed. While defendant argues the other testifying HCSO officers engaged in the same protected activity and speech as plaintiff, the record before the Court only contains a transcript of plaintiff's testimony. Therefore, the Court cannot determine that the other officers testified similarly to plaintiff, only that they testified.[10] Without such evidence, this case is unlike those in which it is demonstrably clear other employees engaged in the same activity or speech as a plaintiff and did not suffer any adverse employment repercussions. See, e.g., Allocco, 221 F. Supp. 2d at 1369-70; Gainer, 170 F. Supp. 2d at 1231-32.

**B. Whether Plaintiff's Employment Would Have Been Terminated Regardless of Reporting and Testifying Against Archer**

Defendant next argues that plaintiff's dismissal "was a direct result of his decision to play the recording of his private meeting with Lt. Reed and Lt. Stevens to subordinates on his shift while disparaging the agency and his supervising lieutenants."

---

[10] The record indicates that plaintiff was the first police officer to interact with Archer at the residence and that some of Archer's incriminating statements to plaintiff may not have been when other officers were present.

(Doc. #40, p. 20.) Therefore, defendant argues summary judgment is still appropriate because plaintiff would have been discharged regardless of his involvement in the Archer matter. (Id. pp. 19-22.) The Court will address this argument as it relates to each of plaintiff's claims.

### 1. Whistleblower Claim

Once a claimant makes a *prima facie* showing of retaliation under Florida's Whistleblower Act, the employer may present legitimate, non-retaliatory reasons for the employment action in question. Turner v. Inzer, 521 Fed. App'x 762, 764 (11th Cir. 2013); see also § 112.3187(10), Fla. Stat. (stating that it is a defense "to any action brought pursuant to this section that the adverse action was predicated upon grounds other than, and would have been taken absent, the employee's or person's exercise of rights protected by this section"). To carry the burden of showing that plaintiff was terminated for a legitimate, non-retaliatory reason, defendant "must only articulate a reason that 'might motivate' a reasonable employer to take the challenged employment action." Wagner v. Lee Cty., 678 Fed. App'x 913, 924 (11th Cir. 2017) (citing Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). If defendant can articulate a legitimate, non-retaliatory reason for the employment action, plaintiff then bears the burden of proving by a preponderance of the evidence that the

reason given was pretextual.  See Turner, 521 Fed. App'x at 764 (citation omitted).

Defendant argues that regardless of plaintiff's involvement in the Archer matter, plaintiff would have been discharged due to his alleged insubordination and comments disparaging HCSO.[11]  (Doc. #40, p. 20.)  The Court finds defendant has articulated a legitimate, non-retaliatory reason for plaintiff's dismissal.

Police departments have an "unquestionable need for a high degree of order, discipline, and loyalty among their officers." Allocco, 221 F. Supp. 2d at 1371.  Plaintiff's alleged actions in questioning the validity of his orders to his subordinates and disparaging his superiors threatened that order, discipline, and loyalty.  See Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) ("Order and morale are critical to successful police work: a police department is a paramilitary organization, with a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers." (marks and citation omitted)).  While plaintiff challenges the factual basis for defendant's conclusion that plaintiff was insubordinate and

---

[11] For purposes of addressing this argument, the Court will assume without deciding that plaintiff has proffered sufficient evidence to establish a *prima facia* case of retaliation under Florida's Whistleblower Act.

adversely affecting morale, (Doc. #52, p. 10), "a termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred." <u>Allocco</u>, 221 F. Supp. 2d at 1371 (citing <u>E.E.O.C. v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1176-77 (11th Cir. 2000); <u>Elrod v. Sears Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991)); <u>see also</u> <u>O'Neil v. St. Johns River Water Mgmt. Dist.</u>, 2018 WL 4565752, *7 (M.D. Fla. Sept. 24, 2018) (analyzing a Whistleblower claim and noting that as long as an employer is not acting in retaliation, the "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all" (quoting <u>Nix v. WLCY Radio/Rahall Commc'ns</u>, 738 F.2d 1181, 1187 (11th Cir. 1984)).

Since defendant has presented a legitimate, non-retaliatory reason for the employment action, the burden shifts to plaintiff to show by a preponderance of the evidence that the proffered reason is pretextual. To show pretext, plaintiff cannot recast the proffered reason but "must meet it head on and rebut it," showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's rationale." <u>Trigo v. City of Doral</u>, 663 Fed. App'x 871, 873 (11th Cir. 2016) (citing <u>Holland v. Gee</u>, 677 F.3d 1047, 1055-56 (11th Cir. 2012)). The Court does not judge whether an employer's decision is prudent or fair, <u>id.</u>, but instead must, considering all of the evidence, "ascertain whether the plaintiff has cast doubt on the defendant's

proffered non-[retaliatory] reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct," Turner, 521 Fed. App'x at 764 (marks and citation omitted).

Plaintiff's Response to the Motion for Summary Judgment only briefly addresses whether defendant's reason is pretextual, noting simply that "no reasonable employer could have found [plaintiff]'s actions to be so egregious that they merit termination, particularly in light of conduct performed by other deputies with little to no repercussions." (Doc. #52, p. 20.) The first part of this argument, whether a reasonable employer would have terminated plaintiff's employment, goes to whether defendant has proffered a legitimate, non-retaliatory reason for the termination, see Wagner, 678 Fed. App'x at 924, which was previously addressed.

The second portion of the argument, that other deputies engaged in conduct that did not result in repercussions, also misses the mark. While a plaintiff can attempt to meet his burden of showing pretext with evidence that other employees were treated differently despite engaging in similar acts as the plaintiff, the plaintiff must show that the other employees are similarly situated to the plaintiff "in all relevant respects." Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008) (citation omitted). Here, plaintiff does not even identify the "other

deputies" he is referring to, making it impossible to determine

whether they are similarly situated to him.[12]

In reviewing the record, it seems the only admissible evidence

plaintiff relies upon to demonstrate he was terminated because of

his involvement in the Archer matter is the timing of the various

actions HCSO took.[13]  But while suspicious timing may establish an

---

[12] Even if the Court were to assume plaintiff is referring to
the other officers who listened to the recording, there were no
allegations that those officers made comments questioning their
orders or disparaging their superiors, as plaintiff is alleged to
have done.  Therefore, these officers could not be considered
similarly situated to plaintiff "in all relevant respects" for
purposes of the pretext analysis.  See Rioux, 520 F.3d at 1280
("Misconduct merely 'similar' to the misconduct of the disciplined
plaintiff is insufficient." (citation omitted)); Burke-Fowler v.
Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (noting
that to determine whether employees are similarly situated, court
requires "the quantity and quality of the comparator's misconduct
be nearly identical to prevent courts from second-guessing
employers' reasonable decisions and confusing apples with oranges"
(citation omitted)).

[13] Plaintiff also relies upon his subjective belief that his
employment was terminated because he testified against Archer, and
Lieutenant Woods deposition testimony that he heard rumors
plaintiff was fired in retaliation.  (Doc. #52, pp. 1, 4; Doc.
#45-1, p. 7; Doc. #45-11, pp. 476-78.)  However, such evidence
does not create genuine issues of material fact.  See Shockley v.
Barbee, 2018 WL 4057227, *2 (11th Cir. Aug. 27, 2018) (noting
"general rule that inadmissible hearsay cannot be considered on a
motion for summary judgment"); Cordoba v. Dillard's, Inc., 419
F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a
genuine issue of fact; instead, it creates a false issue, the
demolition of which is a primary goal of summary judgment."
(citation omitted)); Vernier v. USA, 2016 WL 362432, *2 (M.D. Fla.
Jan. 28, 2016) ("Conclusory allegations based on subjective
beliefs are not sufficient to create a genuine issue of material
fact.").

inference of a causal connection, timing alone is insufficient to demonstrate pretext. See Diehl v. Bank of America, 2011 WL 13174774, *5 (M.D. Fla. Mar. 4, 2011) (noting that "mere coincidence of timing, without more, simply does not suffice to establish pretext"); Dillon v. Carlton, 977 F. Supp. 1155, 1160 (M.D. Fla. 1997) ("[T]he timing of Dillon's termination, standing alone, is insufficient to raise an inference of pretext."); see also James v. Fiesta Food Mart, Inc., 393 Fed. App'x 220, 224 (5th Cir. 2010) (analyzing a Title VII claim and noting "a plaintiff cannot rely solely on suspicious timing to carry his burden at the pretextual stage of the burden-shifting framework"). While plaintiff may believe he was fired because of the Archer matter, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and . . . not on reality as it exists outside of the decision maker's head." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).

Since defendant has proffered a legitimate, non-retaliatory reason for terminating plaintiff's employment, and plaintiff has failed to show that reason is pretextual, defendant is entitled to summary judgment as to Count One of the Amended Complaint. See O'Neil, 2018 WL 4565752, *7 ("That O'Neil disagrees with this reason does not undermine the District's decision or make it pretextual. . . . The question is whether the District was dissatisfied with O'Neil for non-discriminatory reasons, even if

mistakenly or unfairly so or whether it instead merely used this incident as cover for retaliating against O'Neil.  O'Neil has not put forth evidence from which a jury could reasonably conclude that the District's proffered reason for terminating him was merely pretext for whistle-blower retaliation.  Thus, the District is entitled to summary judgment on O'Neil's Whistle-blower Act retaliation claim." (marks and citation omitted)).

### 2. First Amendment Retaliation Claims

The Court now turns to defendant's argument as it relates to plaintiff's First Amendment retaliation claims.  As noted previously, to establish a First Amendment claim of retaliation under section 1983, an employee must show that (1) the speech involved a matter of public concern, (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities, and (3) the speech played a substantial part in the adverse employment action. Wilbourne, 306 Fed. App'x at 476 (citing Cook, 414 F.3d at 1318). Once that showing has been made, the burden shifts to the employer to prove, by a preponderance of the evidence, that it would have terminated the employee even in the absence of the protected speech.  VanDeWalle v. Leon Cty. Fla., 661 Fed. App'x 581, 585 (11th Cir. 2016) (citing Moss v. City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir. 2015)).  "In other words, the defendants may show that retaliation was not the but-for cause for the firing."

Id. (quoting Massey v. Johnson, 457 F.3d 711, 717 (7th Cir. 2006)). The plaintiff then may show that the defendant's proffered reasons are pretextual and that retaliatory animus was the real reason for the adverse action. Id. (citing Massey, 457 F.3d at 717).

Once again, defendant argues plaintiff would have been terminated regardless of his involvement in the Archer matter. Therefore, the Court will again assume for purposes of this argument that plaintiff has proffered sufficient evidence to establish a *prima facie* case of First Amendment retaliation. As such, defendant bears the burden of proving by a preponderance of the evidence that plaintiff's employment would have been terminated regardless of his participation in the Archer matter. Having reviewed the record, the Court finds defendant has met this burden.

Defendant has submitted affidavits from each of the key individuals involved in the internal affairs investigation and the resulting disciplinary action: Lieutenant Reed, Lieutenant Stevens, Lieutenant Rowe, Lieutenant Favara, Captain Harney, Captain Harrelle, Chief Nelson, and defendant. These individuals attest that the decision to initiate the investigation, the investigation and its findings, the decision to recommend disciplinary action, and the decision to terminate plaintiff's employment were all based solely on plaintiff's conduct with regards to the recording. (Doc. #40-1, p. 29; Doc. #40-3, pp.

444-46; Doc. #40-7, pp. 534-35; Doc. #40-8, pp. 557-60; Doc. #40-9, pp. 666-69; Doc. #40-10, pp. 677-78; Doc. #40-11, pp. 681-82.) Each individual also attests that plaintiff's involvement in the Archer matter had no relevance on any of the actions undertaken as part of the investigation and the resulting discipline.[14] (Id.) Accordingly, the Court finds defendant has produced sufficient evidence to show that plaintiff would have been terminated even in the absence of any protected speech involved in the Archer matter.

Defendant having met his burden, plaintiff may show that defendant's proffered reason is pretextual and that retaliatory animus was the real reason for the termination. VanDeWalle, 661 Fed. App'x at 585. The Court finds plaintiff has failed to make such a showing. Besides the timing of HCSO's actions, as discussed in the previous section, plaintiff points to no admissible evidence to doubt that defendant, in good faith, believed plaintiff was insubordinate during the events surrounding the recording, and terminated him accordingly. See id. at 587 ("[Plaintiff] provides no reason or evidence to doubt that [her supervisor], in good

_____

[14] While plaintiff disputes these assertions, he does so based on his subjective belief that everything stems from his involvement in the Archer matter. For example, plaintiff testified at a deposition that he believes Chief Nelson or defendant instructed Lieutenant Stevens to initiate the investigation, then instructed Lieutenant Rowe to make findings to support termination, and then selected the pre-disciplinary panel and instructed them to recommend termination. (Doc. #40-2, pp. 201.) However, there is no evidence in the record to support such a belief.

faith, believed that [plaintiff] had been insubordinate in May 2014, which is our key inquiry when assessing whether an employer or supervisor had an unlawful motive."). Therefore, even assuming plaintiff could make a *prima facie* case of First Amendment retaliation, the Court finds that a reasonable jury would have to conclude that defendant would have terminated plaintiff regardless. See <u>Jackson v. Al. Dep't of Corr.</u>, 643 Fed. App'x 889, 894 (11th Cir. 2016) ("Jackson's First Amendment retaliation claim fails. Even assuming that Jackson's complaints are a matter of public concern, that she prevails on the balancing test, and that her speech was a substantial motivating factor in her termination, a reasonable jury would have to conclude that the defendants would have terminated Jackson even in the absence of her complaints."). As such, defendant is entitled to summary judgment on Counts Two and Three of the Amended Complaint.

## C. Whether Defendant is Entitled to Qualified Immunity

In the final argument in the motion, defendant argues he is also entitled to summary judgment on the basis of qualified immunity. (Doc. #40, pp. 23-25.) Such an argument would only apply to the section 1983 claim made against defendant in his individual capacity. See <u>Williams v. Consolidated City of Jacksonville</u>, 341 F.3d 1261, 1267 (11th Cir. 2003) (noting qualified immunity offers protection for government officials sued in their individual capacities); <u>Rivas v. Freeman</u>, 940 F.2d 1491,

1495 (11th Cir. 1991) (noting that a qualified immunity defense is not available in an "official-capacities-lawsuit"). However, the Court's resolution of the previous argument makes it unnecessary to address this claim. <u>See</u> <u>Fischer v. Fed. Bureau of Prisons</u>, 2008 WL 4371828, *9 n.10 (M.D. Fla. Sept. 23, 2008) (finding that because the defendant was entitled to summary judgment for a different reason, it was unnecessary to address the defendant's argument that he was entitled to qualified immunity).

Accordingly, it is now

**ORDERED:**

1. Plaintiff's request for oral argument is **DENIED**.

2. Defendant's Motion for Summary Judgment (Doc. #40) is **GRANTED.**

3. Judgement shall be entered in favor of defendant and against plaintiff on all counts.

4. The Clerk shall terminate all remaining deadlines and close the file.


**DONE AND ORDERED** at Fort Myers, Florida, this ___9th___ day of January, 2018.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Counsel of record